# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 2, 2004

## STATE OF TENNESSEE v. RONALD HARRISON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-03860   Chris Craft, Judge**

---

**No. W2003-00685-CCA-R3-CD  - Filed December 2, 2004**

---

The Defendant, Ronald Harrison, was indicted for rape, and he pled guilty to the lesser-included offense of sexual battery.  After holding a sentencing hearing, the trial court denied the Defendant's request for judicial diversion, suspended sentence and probation, and sentenced the Defendant to two years in the county workhouse.  The Defendant appeals, contending that the trial court erred when it: (1) denied his application for judicial diversion; and (2) sentenced him to two years.  After thoroughly reviewing the record, we conclude that the trial court did not err when it denied the Defendant's application for judicial diversion.  Further, we hold that the trial court improperly enhanced the Defendant's sentences in light of Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004), and we reduce the Defendant's sentence in accordance with this opinion to the presumptive minimum of one year.  We remand the case for the entry of appropriate judgments of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part, Reversed in Part, and Remanded.**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and J.C. MCLIN, JJ., joined.

Jeffery L. Stimpson, Munford, Tennessee, for the appellant.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; William L. Gibbons, District Attorney General; and Michele Parks, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I.  Facts

This case arises out of the Defendant's conviction for sexual battery, a class E felony.  On June 5, 2003, the Defendant was indicted by the Shelby County Grand Jury on one count of rape, and he pled guilty to sexual battery.  At the Defendant's sentencing hearing, the following occurred.

The victim, T.T.,[1] testified that, at the time of the hearing, she was thirty years old. She said that, in September of 2002, she was working at Forest Hill Funeral Home as an apprentice while going to school to be a mortician. The victim said that the Defendant was her supervisor/manager at the home. She said that approximately six or seven months after she began working at the funeral home, during September of 2002, the Defendant sexually assaulted her. She said:

> We were in the chapel. We had turned off the lights in the building in order to go home. And we were in the chapel where we were turning off the lights in order to leave. And it was real dark in the chapel. And I had made some comments about it being [sic] spirits and scary and spooky in the chapel. And [the Defendant] told me to come back to the back part where the two doors are in the middle of the chapel. And he told me it's darkest back here. And so when we went back there, we stood back there. And I was like, I'm scared being back here because it was dark and the spirits, and he made a comment. He didn't say it in a manner that was, I guess supposed to make me scared, it was a joking manner. The only thing you have to fear is me. And he didn't say it in a way to intimidate me. But then after that, he rubbed my breast area and my stomach. He was behind me. And he asked me if I—if he could kiss me. And I said huh-uh. He kissed me anyway. It's the pews or benches like those out there in the chapel. He told me to sit down. I sat down. And he told me he wanted me to touch him. I was just scared. So I touched him . . . his genitals.

The victim said that she was scared because the Defendant was her supervisor, and she asked "who am I going to tell?" The victim said that the Defendant unzipped his pants and pulled out his penis. She said that he pulled her head to it and put her hands on it. She said the Defendant walked her around the bench, bent her over, and had sex with her. She again said she was scared.

The victim testified that she did not immediately tell the police about the incident, but a few days later, she told her uncle, who is a police officer. She said that it took a few days to tell anyone about the incident because she "just thought he made me do something I didn't want to do. I thought rape was getting beat[en] up and brutal." The victim said that she said "huh-uh," before she "just froze."

The victim testified about the impact that this incident has had on her life. She said that she goes to counseling and has been diagnosed with post traumatic stress disorder. She testified that, because of this assault, she attempted to kill herself twice, once by taking a lot of pills and another time by cutting herself. The victim said she is still in counseling and goes once a week. She said that she is taking anti-depressants and tranquilizers. She testified that she has to start her life over because she no longer wants to be a mortician, even though she graduated at the top of her class. The victim said that the Defendant hurt her, and she is scared to be in a closed environment. She said that she cannot trust anyone.

---

[1] It is the policy of this Court to refer to victims of sexual offenses by their initials only.

On cross-examination, the victim testified that she told the Defendant "huh-uh" one time, and then she froze. The victim said that "huh-uh" means "no." The victim said that the room was dark, and she did not know if the Defendant could see her face.

The Defendant testified that he pled guilty to sexual battery, and he was asking the trial court for judicial diversion or probation. He said that when the victim said "huh-uh" he understood her to say "uh-huh," but "looking back, you know, maybe I should have recognized she didn't mean that. But she offered no other resistance. I had no reason to think otherwise." He said that, now that he has seen what this encounter has done to the victim, he regrets his actions "terribly." The Defendant apologized to the victim and to her family. He said that he used poor judgment, and he was deeply sorry. He said that he regretted his actions every day.

The Defendant testified that he understood that the victim had filed a civil suit against him and that his statement would prove her case. He said that there was also another sexual harassment lawsuit pending against his company, but the suit was stayed by the company's bankruptcy. The Defendant said that he has never been arrested before and has only had a few speeding tickets in the past. The Defendant said that he just wanted to get this behind him and never go through anything like this again. He said that he understood that he could be required to register as a sex offender wherever he lives for the rest of his life.

On cross-examination, the Defendant stated that, several years ago, he had consensual sexual relations with two other female employees. The Defendant said that, when he was first questioned by the police about this case, he said that he had "never touched" the victim. He said that he "had given [his] employer a statement that nothing had happened because [he] knew [he] would lose [his] job if [he] told them otherwise." The Defendant said that, after he was arrested, he admitted to his wife and his attorney that he had intercourse with the victim. The Defendant said that he understood the victim to have said "uh-huh" and that he kissed her and things just progressed from there. He said that she offered no other resistance. He testified that he did not plan to "make a move. It just happened." On re-direct examination the Defendant said that the incident occurred in a "fairly large room" that had several exits.

When sentencing the Defendant, the trial court stated:

Well, looking at the diversion consideration in State v[.] Bonestel . . and State v. Parker. His [amenability] to correction, I think is a question mark. I don't know if he'll be able to stop this sexual activity. I think he'll probably if he were placed on probation, probably wouldn't violate out of fear. I'm not sure he wouldn't start right back later. The circumstances of the offenses are extremely aggravated in my opinion, especially the los[s] to this woman of her career. He has no criminal record other than smoking dope in the past a few times. His social history is somewhat suspect given past sexual harassment of employees and people that he worked with which is just an absolutely horrible thing. His physical and mental health appears to be normal.

A key here to diversion is deterrent value to the accused. I just don't see him doing this and feeling like nothing happened. That he can get away with it. And whether judicial diversion would serve the interest of the public as well as the accused, it seems to me that this man needs a felony record because I have a distinct feeling, given her testimony and his testimony, [the Defendant] is lying. And it's just almost as clear as I can be, the difference between his testimony and hers, is this lady is telling the truth. And I just cannot give this man diversion for violating her the way he did. He knew it was wrong and just did it anyway.

A striking thing about this case is looking at the [D]efendant's version of these facts which are, although the [D]efendant testified and acts like well, you know, I thought she said uh-huh. And she said huh-uh, and really, we really agree on the same things, it was just a mistake. And I noticed the [D]efendant's testimony where he said I made a mistake. This wasn't a mistake. This was a purposeful violation of another human being. Treating them as meat when you were controlling them as supervisor. And a particular other quote he said, she offered no other resistance. When a lady is working at a work place and her boss is in control of her career that she's gone to school for, what kind of resistance is she supposed to offer? How in the world can anybody be justified in putting somebody in that position?

Suppose one of my clerks here, I asked them to have sex with me after court today? What are they going to do? Realizing that if they complain against me, they're not ever going to get promoted in the clerk's office. Lawsuits, all of these politicians mad at them, them mad at me. All of this stuff going on. It's just absolutely inexcusable in today's world. But here's what he says. Here's the story he tells in his presentence report. [T.T.] and I . . . were the last two employees left to close down the building at 5 p.m. After turning off the lights in the chapel, she said it was scary in there. I told her there was nothing to be afraid of. She walked over and stood close beside me. I asked if I could kiss her. She said un-huh. I kissed her and then I touched her breast. I sat down on one of the pews. She straddled my lap. Okay. None of this was mentioned by this [D]efendant just a minute ago. She straddled my lap. I unbuttoned her shirt, lifted her bra, began touching her breast. After a short time, I asked if she would touch me. Well, obviously if she's going to get on his lap and straddle it and give him a little lap dance, obviously he would think, yeah, sure, go for it. But that's not what happened. No. This fellow's just flat lying about what happened. And he needs to realize that he's not telling the truth. His wife needs to realize that he's lying. She got off my lap and sat on the pew. I stood in front of her and unzipped my pants. She took out my penis and beg[an]giving me oral sex. After a short time I told her we should stop because Dub Nance and Wendel Smith should be right—in other words, he's the one that said let's stop, not her. [We] [w]ent to the funeral director's work office after we fixed our clothes. Dub and Wendel arrived at that time. And then 20 minutes went by with

-4-

other people around them. And then they clocked out and left. And we went back in the chapel. I took off my pants and she began giving me oral sex again. I removed her pants and gave her oral sex.

Now, somehow the victim forg[ot] to leave out the fact that she took off her clothes and he gave her oral sex for a while. That just—it just flat didn't happen. This man is a liar. I stood up and walked around behind the pew and motioned for her to follow me. She walked around and stood in front of me. She bent over and I penetrated her vagina from behind. After we were finished, I picked up my clothes and went to the men's room to clean up. She went to the ladies room to clean up and get dressed. After we were dressed, she clocked out and we left.

This is just—there's just no way this is a true version. This man wants to get here and say, Judge, I'm going to commit perjury in front of you and commit a felony right in front of your eyes. And I want probation, diversion. It's just not going to happen, [Defendant]. If you'd taken the stand and you'd told the truth ab[o]ut what was going on, then maybe we would do something for you. But you're still lying. You're still persecuting this young lady. And that's the problem. You still can get a job somewhere, but all those years of work she ha[s] have come to no avail. She offered no other resistance. That's the quote that I wrote down. Absolutely no diversion, not only because of the past episodes which weren't crimes, but because you're lying today on the stand, absolute lack of candor. You want to say just enough to where everybody will believe that it was an honest mistake. This was not a mistake. It was a crime. And when you were in charge – one of our enhancement factors and I'll just read it from the statue that I can use to apply.

I absolutely find in this case that the [D]efendant abused a position of private trust in this case. Looking at the probation considerations, there's a presumption of an alternative sentence. I've considered the presentence report; his physical and mental condition, his social history as I've described. The facts and circumstances surrounding the offense; the nature and circumstances of the criminal conduct which were aggravated for a sexual battery case. This wasn't just a case where somebody walked up to somebody standing at a stop sign and grabbed their breast. This was a calculated, intimidation of someone else that was under your care. To take advantage of her and basically be a predator of her body.

I've considered your lack of criminal history other than this marijuana smoking. The previous actions of the [D]efendant. The fact that the other complaints were going on. That you were doing this to people who were working for your employer as well as being their supervisor. Whether or not you might reasonably expect to be rehabilitated. I just, because of the lies, I don't really think that this man is rehabilitated. And I think that this man will probably re-offend again some day as soon as he's in a position of power over women. Whether or not you'll

abide by the terms of probation, and I think he will. I think he's scared. And I think he'll abide by the terms of probation. Whether or not the interest of society and being protected from possible future criminal conduct from the [D]efend[ant] are great. I would say yes, they are. No measures less restrictive than confinement have been applied because he's never been prosecuted before.

Whether or not a sentence of full probation would unduly depreciate the seriousness of the offense. Absolutely yes. It would make him feel like he's not a criminal, and what he did is really not right and that he's the one that's being misunderstood. Whether or not confinement is particularly suited providing effective deterrent to others. It may be. I really can't find that from the record, but it very well may be if this gets around in the funeral home business. I thought in this case because of [the] presumption of an alternative sentence, that maybe he would deserve some kind of alternative sentence and not full probation.

The problem I see in this, though, is with this man actually having the gall to get on the stand and say, yes, she told the truth. We just had a misunderstanding, completely mitigates against giving this man any probation whatsoever.

The trial court then sentenced the Defendant to two years in the work house.

## II. Analysis

The Defendant presents two issues for review, both of which involve his sentence. First, he contends that the trial court erred when it denied his request for judicial diversion. Next, he asserts that the trial court erred when it ordered enhanced his sentence. When a defendant challenges the length or manner of service of a sentence, it is the duty of this Court to conduct a de novo review of the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "'conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Ross, 49 S.W.3d 833, 847 (Tenn. 2001) (quoting State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999)); State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court that are predicated upon uncontroverted facts. State v. Dean, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). In conducting a de novo review of a sentence, we must consider: (a) any evidence received at the trial and/or sentencing hearing; (b) the presentence report; (c) the principles of sentencing; (d) the arguments of counsel relative to sentencing alternatives; (e) the nature and characteristics of the offense; (f) any mitigating or statutory enhancement factors; (g) any statements made by the defendant on his or her own behalf; and (h) the defendant's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-210 (2003); State v. Taylor, 63 S.W.3d

400, 411 (Tenn. Crim. App. 2001). The party challenging a sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401(d), Sentencing Comm'n Cmts.

In the case under submission, we conclude that there is ample evidence that the trial court considered the sentencing principles and all relevant facts and circumstances. Therefore, we review its decision de novo with a presumption of correctness. Accordingly, so long as the trial court complied with the purposes and procedures of the 1989 Sentencing Act and its findings are supported by the factual record, this Court may not disturb this sentence even if we would have preferred a different result. See Tenn. Code Ann. § 40-35-210, Sentencing Comm'n Cmts; State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). We note that the defendant bears the burden of showing that the sentence is improper. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; Ashby, 823 S.W.2d at 169.

## A. Judicial Diversion

The Defendant argues that the trial court abused its discretion in declining to impose a sentence pursuant to Tennessee Code Annotated section 40-35-313 (2003), commonly referred to as "judicial diversion." According to this statute, the trial court may, at its discretion, following a determination of guilt, defer further proceedings and place a qualified defendant on probation without entering a judgment of guilt. Tenn. Code Ann. § 40-35-313(a)(1)(A). A qualified defendant is one who:

(a) Is found guilty of or pleads guilty or nolo contendere to the offense for which deferral of further proceedings is sought;
(b) Is not seeking deferral of further proceedings for a sexual offense[2] or a Class A or Class B felony; and
(c) Has not previously been convicted of a felony or a Class A misdemeanor.

Tenn. Code Ann. § 40-35-313(a)(1)(B)(i)(a), (b), (c) (footnote inserted). When a defendant contends that the trial court committed error in refusing to grant judicial diversion, we must determine whether the trial court abused its discretion by denying the defendant's request for judicial diversion. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); State v. Cutshaw, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997). Judicial diversion is similar to pretrial diversion; however, judicial diversion follows a determination of guilt, and the decision to grant judicial diversion is initiated by the trial court, not the prosecutor. State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992). When a defendant challenges the trial court's denial of judicial diversion, we may not revisit the issue if the record contains any substantial evidence supporting the trial court's decision. Cutshaw, 967 S.W.2d at 344; State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). In Anderson, this Court stated:

---

[2]Sexual battery is not a "sexual offense" as defined by this section of the statute.

-7-

We conclude that judicial diversion is similar in purpose to pretrial diversion and is to be imposed within the discretion of the trial court subject only to the same constraints applicable to prosecutors in applying pretrial diversion under Tennessee Code Annotated § 40-15-105. Therefore, upon review, if "any substantial evidence to support the refusal" exists in the record, we will give the trial court the benefit of its discretion. Only an abuse of that discretion will allow us to overturn the trial court.

Anderson, 857 S.W.2d at 572 (citation omitted).

The criteria that the trial court must consider in determining whether a qualified defendant should be granted judicial diversion include the following: (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; and (6) the deterrence value to the defendant and others. Cutshaw, 967 S.W.2d at 343-44; Parker, 932 S.W.2d at 958. An additional consideration is whether judicial diversion will serve the ends of justice, i.e., the interests of the public as well as the defendant. Cutshaw, 967 S.W.2d at 344; Parker, 932 S.W.2d at 958; State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993), *overruled on other grounds by* State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

In the case under submission, the trial court found that the Defendant's amenability to correction was a "question mark," because it did not "know if he'll be able to stop this sexual activity." The trial court also found that the circumstances of this offense were "extremely aggravated" considering the victim's loss of her career. The trial court stated that the Defendant's social history was "suspect given past sexual harassment of employees and people that he worked with . . . ." Finally, the trial court considered the deterrence value to the Defendant and others and found, "I just don't see him doing this and feeling like nothing happened. That he can get away with it." Further, the court found that the Defendant needed a felony record in order to appreciate the seriousness of his actions, because it was apparent that the Defendant lied to the court. After considering these factors and findings, the trial court denied the Defendant's request for diversion. We conclude that there is evidence in the record to support these findings by the trial court and that it did not abuse its discretion by denying the Defendant's request for judicial diversion.

## B. Enhanced Sentence

The Defendant next asserts that the trial court erred when it ordered that the Defendant be sentenced to the enhanced sentence of two years. In calculating the sentence for a Class E felony conviction, the presumptive sentence is the statutory minimum for a Range I offender if there are no enhancement or mitigating factors. See Tenn. Code Ann. § 40-35-210(c). If there are enhancement but no mitigating factors, the trial court may set the sentence above the minimum, but still within the range. Tenn. Code Ann. § 40-35-210(d). A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann. § 40-35-210(e). The sentence must then be reduced

within the range by any weight assigned to the mitigating factors present. Tenn. Code Ann. § 40-35-210(e). The sentence range for a Range I offender for a class E felony is not less than one (1) nor more than two (2) years. Tenn. Code Ann. § 40-35-112 (2003).

The United States Supreme Court's recent opinion in <u>Blakely v. Washington</u>, 542 U.S. __, 124 S. Ct. 2531 (2004), calls into question the continuing validity of our current sentencing scheme. In that case, the Court, applying the rule in <u>Apprendi v. New Jersey</u>, 566 U.S. 466, 490 (2000), struck down a provision of the Washington sentencing guidelines that permitted a trial judge to impose an "exceptional sentence" upon the finding of certain statutorily enumerated enhancement factors. 124 S. Ct. at 2537. The Court observed that "the 'statutory maximum' for <u>Apprendi</u> purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" 124 S. Ct. at 2537. Finally, the Court concluded that "every defendant has a *right* to insist that the prosecutor prove to a jury [beyond a reasonable doubt] all facts legally essential to the punishment." <u>Id.</u> at 2539.

In the case under submission, the trial court enhanced the Defendant's sentence based upon its finding that one enhancement factor applied, that the Defendant abused a position of trust. <u>See</u> Tenn. Code Ann. § 40-35-114 (16). This enhancement factor was not submitted to a jury or admitted by the Defendant. Therefore, the rule in <u>Blakely</u> precludes the application this factor. Because there are no enhancement factors that were proved to a jury beyond a reasonable doubt or admitted by the Defendant, the sentence must be modified to the presumptive minimum of one year.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the trial court's judgment in part, reverse in part, and remand for entry of a judgment modifying the sentence to the presumptive minimum of one year.

_____
ROBERT W. WEDEMEYER, JUDGE